Filed 9/5/13  P. v. Wish CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B242456 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA069613) |
| v. | |
| JONATHAN WISH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. David B. Gelfound, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jonathan Wish (Wish) was convicted of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)[1] (count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)) (count 3).[2] On appeal, Wish contends that the trial court deprived him of his constitutional right to present a defense when it precluded his ex-wife, Valerie Wish (Valerie), from testifying that the three children she had with Wish were in Argentina at the time of trial. In Wish's view, the trial court's ruling prevented him from proving that Valerie was using the case to deny Wish access to the children, and that she had a motive to lie about the alleged crimes. He further contends that the trial court abused its discretion under Evidence Code section 352 when it allowed the prosecution to present two prior acts of domestic violence under Evidence Code section 1109.[3] We find no error and affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The information did not contain a count 2.

[3] Wish also contends that Evidence Code section 1109 violates his constitutional rights to due process, equal protection and a fair trial. But citing *People v. Price* (2004) 120 Cal.App.4th 224, 239–241 [Evidence Code section 1109 does not deprive a defendant of the right to due process, equal protection and a fair trial, and it is not unconstitutional on its face], *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 (*Hoover*) [Evidence Code section 1109 was not unconstitutional as applied], *People v. Johnson* (2000) 77 Cal.App.4th 410, 416–420 (*Johnson*), and *People v. Falsetta* (1999) 21 Cal.4th 903, 917–918 (*Falsetta*) [Evidence Code section 1108, pertaining to evidence of another sexual offense, does not transgress constitutional principles because Evidence Code section 352 provides an adequate safeguard to evidence that would create undue prejudice], Wish concedes that California courts have rejected the same constitutional challenges that he asserts now. Nonetheless, he asserts these challenges to preserve them for federal review. Suffice it to say, we follow the lead of Court of Appeal cases such as *Hoover* and *Johnson*. And even though *Falsetta*'s holding pertained to Evidence Code section 1108, we perceive no material distinction between Evidence Code sections 1108 and 1109 for constitutional analysis. Thus, we deem the analysis in *Falsetta* as controlling. There is no reason for us to analyze the issue further. In our analysis of section 1109, we focus on state law issues.

# FACTS

## The Prosecution Case

Valerie is from Argentina. She came to California on a student visa in 1997 when she was 18 years old. Her visa expired in 2000 but she remained in California. In 2001, Valerie began living with Wish, who was 16 years her senior. They got married in July 7, 2003. Part of the reason that they got married was that Valerie was about three months pregnant.

On July 25, 2003, Valerie had contractions and bleeding, so she made a doctor's appointment. At the time, Tyger Wish (Tyger), Wish's son from a prior marriage, was visiting. Wish told Valerie that he would not go to the appointment with her because he wanted to stay with Tyger. Valerie testified that when she returned home from the appointment, she was upset that Wish did not go with her. He said that he wanted her to get an abortion. She said no, and he threatened to leave her. When he began packing his belongings, Valerie decided that she would go to her parents' house. Wish stopped her by pushing her to the floor, sitting on her stomach, grabbing some telephone cables and tying her wrists and ankles. Then he punched her in the stomach. He left her tied up on the floor and went outside to talk on his cell phone. Her parents came over to the house. She told them not to touch her and asked them to call the police. They did not want to call the police because they were in the country illegally. Her father was upset. He untied her and took her to his house. That evening, her parents said that she should go to the police, so she went to the police station and filed a report. Wish was arrested but not prosecuted.

About a month later, Wish and Valerie reconciled. She applied for permanent residency, and Wish sponsored her.

3

They had three children together: twin boys born on April 2005, and a girl, who was born on November 2008.[4] Every time Valerie said she wanted to leave the marriage or they had problems, Wish threatened to take the children away and have her deported.

Valerie's application for permanent residency was granted in 2009.

Sometime in 2010, Valerie began a romantic relationship with Kingsley Sorge (Sorge). She told Wish about it. He got "[r]eally mad."

On December 25, 2010, Wish and Valerie were separated but were living together in a house. They had discussed divorce. On Christmas day, Valerie went to a friend's house to retrieve presents for the children. When Valerie returned home, Wish would not let her enter. She could hear the children inside the house, crying. Wish came outside and pushed Valerie, causing her to fall. He asked her to leave. She got into her car and drove away.

Valerie moved in with a friend. For about a month, Wish allowed Valerie to have half-hour, monitored visits with the children. On January 24, 2011, Wish finally allowed her to keep the children for an entire day. Without Wish's consent, Valerie drove the children to New Jersey. But before she left, she told one of Wish's friends the address of the place she would be staying and asked him to inform Wish of her plan.

In early 2011, Wish filed for divorce. He also filed court documents stating that he wanted custody of the children. Valerie was ordered to bring the children back to California. She complied even though she did not want to. Starting in March 2011, the family court held multiple hearings on custody. Valerie told the family court that Wish calls the children "little shits" and "stupid," and that he was verbally abusive toward her and the children. Her attorney told the family court about the July 25, 2003, incident. Nonetheless, Wish was allowed to visit the children multiple times. On July 7, 2011, the family court ruled that Valerie would stay in California for the summer with the children.

---

[4] The record of the trial is silent regarding whether Valerie had a child from her 2003 pregnancy. At a pretrial hearing, the prosecutor stated that Valerie's pregnancy ended with a miscarriage.

4

In addition, the family court granted Wish visitation with the children on three weekends out of every month. On those weekends, she was supposed to drop the children off at 5:00 p.m. on Friday at Frazier Park. The family court ordered a child custody evaluation to determine whether Valerie should be allowed to take the children back to New Jersey.[5] She was confident that she would prevail on that issue because the children feared Wish and did not want to be around him.

Valerie worked as a colonic hydrotherapist. She owned her own colonic hydrotherapy machine. She did treatments in the back of a gym, but she wanted to "set up a better place for it, a better job."

On Friday, July 15, 2011, Valerie was supposed to take the children to Wish for a weekend visit. At 4:00 p.m., the children were playing outside the home of a neighbor, Elizabeth Giarrizzo (Giarrizzo). Valerie's twin boys were six years old and in the same class as Giarrizzo's twin boys. The four of them were making plans for a sleepover at Giarrizzo's home. As a result, Valerie's twins asked if they could visit Wish on a different weekend. At about 5:00 p.m., Wish called. He was still at his house, which was an hour away, and needed "to get stuff ready." He told Valerie that he would call her when he was near an agreed drop-off location, which was a neighborhood park near Valerie rather than Frazier Park.[6] Twenty minutes later, she called and asked if he wanted to pick up the children the next day because they had a play date that evening with their friends. Wish said that he was already on his way, and that he would meet her at the park near her home. A while later, he called and said he was running late because his car had overheated.

At about 6:00 p.m., Valerie left her home to meet with a doctor about a job working in a doctor's office. The office was 20 minutes away. When she was cross-

---

[5]     The evaluation may have been ordered earlier. Valerie testified that it had been pending for "months" before July 7, 2011.

[6]     At trial, Valerie stated: "The court order says Frazier Park, but lots of times [Wish] was in Valencia[,] so we [would] meet by a park around the block from my house."

examined and asked about her "job interview," she said, "Well, it wasn't . . . a job. I had a [colonic hydrotherapy] machine that I wanted . . . to put in [the office of an alternative medicine doctor][.]" Later, she stated, "Yes. It's a job, but I have a machine that I had in Valencia and I was possibly looking to bring it to this doctor's office . . . to do treatments. So I went to talk to him[.]" After talking to the doctor, she realized that he could not offer her a sufficient location for the machine. Wish called at about 6:30 p.m. and said he was in town. She told him that she was going to drive back home, pick up the children and call when she was close to the park. She went home, and then went to Giarrizzo's home to tell the children it was time to meet Wish. They did not want to go. She spoke to Wish on the phone. During that call, he said he was going to eat at the mall and drive to the park afterwards, then he called her a "bitch" and accused her of trying to keep the children away from him. After that, she tried to convince the children to get into the car. Eventually, however, the children prevailed upon her to meet Wish by herself. They wanted her to ask if they could sleep over at Giarrizzo's and start their visit with Wish in the morning.

Giarrizzo testified that Valerie, her children and Sorge came over to Giarrizzo's home at 5:00 or 6:00 p.m., but possibly earlier. Giarrizzo's twin boys started playing with Valerie's twin boys. According to Giarrizzo, "We were all there for quite a while." She did not see Valerie leave prior to 7:15 p.m., and did not recall Valerie mentioning a job interview. At 7:00 or 7:30 p.m., Valerie said she had to meet with Wish to discuss "some court documents and that she was going to go by herself." She did not want to bring the children because Wish had a tendency to get argumentative and verbally abusive, and she did not want them to see Wish get upset. Before Valerie left, she asked Giarrizzo to watch the children and help Sorge. At no time did Valerie and Giarrizzo discuss a plan for the children once Valerie returned. When Valerie left, there were no injuries on her face. Sorge remained with Giarrizzo and the children. He never left.

According to Valerie, she drove toward the drop-off location at about 7:30 or 8:00 p.m. and saw Wish at a nearby cross street. They pulled over and got out of their cars to talk. He asked if the children were with Valerie. She said that they were at a

6

neighbor's house, and they were very excited about staying over the weekend to play with their friends. Wish got upset and told Valerie to go and get the children. She said that they really wanted to sleep over at the neighbor's house and asked if Wish would trade weekends. In the alternative, she said he could pick them up the next morning, or the next morning she would drive the children to him. He refused to change or modify his visit.

Valerie gave Wish some divorce papers and told him that they were for his income and expense declarations.[7] He accused her of wanting a divorce so that she could marry someone else. He called her names and began yelling and swearing. At that point, she asked whether he would let the children go to their sleepover party, or if she should go get them. Instead of answering, he kept yelling and swearing. Then he threw the divorce papers into his car.

As for what happened next, Valerie first testified, "Unexpectedly he turn[ed] around and punch[ed] me in the face." When asked where, she pointed to a red scar above her left eyebrow. After that, she testified: "I notice[d] I was bleeding on my head and he looked at me and he told me you are not [going to] report me. If you do[,] I will get out and I will kill you and the children." Wish told her to go back to the neighbor's house, get the children and meet him at the park. She told him she would do that and left.

On cross-examination, Valerie testified that she is 5 feet, 7 inches tall and weighs 110 pounds. Wish is 5 feet, 11 inches tall and, at the time of the incident, weighed 220 pounds. While he was yelling and swearing about the divorce papers, they were standing in the middle of the street facing each other. She was afraid of him. According to Valerie, he threw the papers in his car, turned around and punched her in the face. But then Valerie testified: "I didn't even look when he turned around. I was distracted, and

---

**7** Valerie testified: "And I was holding some papers of the [family court] that I needed to give so [Wish] asked about what was up. So I tried to explain to him because I didn't have a lawyer at that time and I needed him to complete some forms so they can grant divorce. [Wish] needed to do [a] declaration of his expenses." Later she testified that she had needed Wish to "fill out some declarations of his income and stuff like that[.]"

last thing I remember is that, and then I felt some sharp cold thing in my face after that. I wasn't looking." She was asked if she saw a closed fist when he turned around. She testified: "I don't remember if it was a fist or what it was. I remember feeling something cold sharp in my face." After a few more questions, she said, "All I remember is standing there and I remember after that he turn[ed], did something and something hit me on my face. I don't know if it was his fist or something he was holding[.]" Defense counsel asked if she saw him hit her in the face, and she replied: "I saw his fist. I did [see] his fist in my face. It was really fast." Next, the defense counsel asked if she was "bleeding heavily." She said yes. Then the defense counsel asked: "Were you bleeding all over your clothes?" Valerie said, "Yes. It was pouring down my clothes." The blood was "pouring out of [her] face" while she was standing in the street. She also stated: "I don't remember seeing blood in the floor. I remember the blood [pouring] down my face and then very shortly after that I got into my car. I remember having blood all over the door on my car." She "wasn't bleeding in the street." After she was hit, she put her hand on her face and "was bleeding down" her face.

When Valerie left Wish, she went to the Santa Clarita Sheriff's station and said she had been hit. The drive from the park was approximately three or four miles. Deputy Sheriff William Formica made contact with Valerie at the station at about 8:30 p.m. She told him that she had been hit by her husband 30 minutes ago. He noticed that she had a large laceration with blood protruding from it. Her nose was slightly swollen, and her eyebrows were a little puffy and red. When asked if he saw blood on her clothes, he testified, "I do not recall." If there had been blood, he would have made a note of it. There was no note regarding bloody clothes in his report.

Valerie had a one inch laceration above her left eye. She was taken to the hospital by paramedics and received 13 stitches. She was treated by Dr. Darrin Privett at 8:45 or 9:00 p.m. She complained of pain, and she said that her nose had been bleeding, but it had stopped. Dr. Privett did a CT scan of her orbital bone and did not detect a facial fracture. The laceration "was fairly deep[.]" The injury was "potentially" consistent with being hit by a fist. When asked if an assailant could hit somebody in the face with a fist

8

and have no injury to his hand. Dr. Privett said, "Potentially, yeah. It just depends." He explained that the skin is thin where Valerie suffered the injury, "so it doesn't take much to hit that skin and it can pop open. So it doesn't need a whole lot of trauma or force. It just needs direct contact." He acknowledged that she could have been hit by a foreign object.

Defense counsel asked Dr. Privett whether an injury like Valerie's is one that "bleeds profusely[.]" Dr. Privett said that it "just depends."

While Valerie was being stitched up, which was 20 to 30 minutes after she arrived at the hospital, she told Deputy Formica that when she got to the park, she gave Wish some paperwork. He got upset and asked where the children were. She did not specify. Instead, she asked him to review the paperwork and send it back to court. She said she turned around and walked back toward the vehicle. Wish stopped her. They had a real quick discussion about something. Then, according to her version of the incident, Wish punched her in the face with a closed right fist and knocked her backwards. At some point, Wish called her a "bitch" and a "slut." Valerie told Deputy Formica that after she was hit, she began bleeding profusely from her nose, and also from the laceration. She told Deputy Formica about the dissolution proceeding and gave him the case number. In addition, she told him the file number for the July 25, 2003, domestic violence claim. She said that Wish was waiting at the park for her to drop off the children.

Sheriff's deputies found Wish at the scene of the crime. He was waiting for Valerie to bring the children. A deputy told Wish that Valerie had accused him of hitting her. Wish denied hitting her and claimed that Sorge, Valerie's boyfriend, had hit her in an attempt to set Wish up. Wish was arrested. The deputies did not find any marks on Wish's hands, nor did they find blood on him or in his car. They looked for blood on the ground, but they did not find any.

Deputy Formica observed Wish in the booking cage. He did not have any injuries to his hands. There were no rings booked into property. If Wish had been wearing any rings, it would have been noted. Detective Juan Carrillo of the Los Angeles County

Sheriff's Department spoke to Valerie the Monday after the incident. She said she wanted Wish prosecuted.

Valerie obtained a restraining order against Wish. On August 10, 2011, her divorce from Wish was final. On August 27, 2011, the family court informed Valerie that she could move to New Jersey, and that the children could start school there.

At the time of trial, Valerie's parents were in Argentina.

Valerie was asked if she wanted Wish to have custody of the children or visitation. She said no to both.

**The Defense Case**

Valerie testified that on July 15, 2011, she told Giarrizzo that she was nervous about meeting Wish alone because she had court papers for him and the children were staying home. In September 2011, Valerie took the children with Sorge and her back to New Jersey.

Tyger was called to the stand.[8] At the time of the July 25, 2003, incident, Wish was on crutches due to knee surgery. Wish said something about Tyger's mother taking him home and Valerie got upset. She started yelling and cursing at both Wish and Tyger. While Wish was walking down the hallway, Valerie tackled Wish "down off his crutches." She sat on him, punched him in the face and kicked him three times. Wish called Valerie's father, who came to the house and took her away. Tyger talked to the police later that day, but the police report regarding the incident did not contain a statement from Tyger.

**Conviction; sentence**

The jury found appellant guilty on counts 1 and 3. The trial court selected the mid-term of three years in state prison on both counts. It stayed the sentence on count 3 pursuant to section 654.

This timely appeal followed.

---

[8] Tyger was born in October 1993.

**DISCUSSION**

## I. The Right to Present a Defense.

Wish argues that the trial court deprived him of his constitutional right to present a defense when it relied on Evidence Code sections 350 and 352 to exclude evidence that the children were in Argentina at the time of trial. In Wish's view, that evidence was relevant to prove that Valerie was using the July 15, 2011, incident to keep and control the children; to prove that Valerie had prevented Wish from contacting the children; to prove that Valerie had a motive for lying; and to prove that Valerie was not credible. In other words, the evidence was necessary to prove that Valerie fabricated Wish's crimes. This argument lacks merit. As we shall discuss, the location of the children at the time of trial did not have significant probative value. Beyond that, there was strong evidence in the record supporting Wish's defense. Upon review, we conclude that the trial court did no violence to Wish's rights.

A. <u>The law</u>.

Only relevant evidence is admissible. (Evid. Code, § 350.) A trial court may, in its discretion, "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The rules of evidence "must yield to a defendant's due process right to . . . present all relevant evidence of *significant* probative value to his or her defense. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999; *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [the federal Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense].) "Although completely excluding evidence of [a] . . . defense [is] theoretically [impermissible], excluding . . . evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) "For a defendant's constitutional rights to override the application of ordinary rules of evidence, '"the proffered evidence must have more than 'slight-relevancy' to the issues presented.

11

[Citation.] . . . [Citation.] The proffered evidence must be of some competent, substantial and significant value. [Citations.]" [Citation.]'" (*People v. Anderson* (2012) 208 Cal.App.4th 851, 880.)

A trial court violates a defendant's right to confront a witness if ""'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1188; *People v. Ducu* (1991) 226 Cal.App.3d 1412, 1414–1415 [the confrontation clause ""'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish"'"].)

When a trial court violates a defendant's constitutional right to present a defense or cross-examine a witness, we must reverse his conviction unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 652.)

B. The relevant proceedings.

During the People's case-in-chief, defense counsel cross-examined Valerie and asked if her children were presently in Argentina. The prosecutor objected based on relevance.

The trial court called the attorneys to sidebar. The prosecutor argued that the location of the children, at the time of trial, was irrelevant. Even though the custody

12

dispute was relevant, the prosecutor argued that evidence regarding that dispute needed to be "closer in time to the July 15, 2011 incident." Defense counsel argued that the "whole case is that [Valerie] is using this incident to keep and control those children. And . . . [because of this] incident she has the children and has kept them from him. And that since this incident she has not allowed him to speak to them, has not allowed them to visit with him much, has not allowed them to even talk to [him]. He has not had any contact at all, and I think that is something that is relevant, and I think that is something that relates directly to the motive for lying[.]"

In response to the argument of counsel, the trial court stated, "My ruling is as follows: during the pretrial rulings we talked about the custody issue and both counsel indicated that they wouldn't be going into great detail with the custody issues. I've allowed both prosecution and the defense to go extensively into the custody issues. At this point I think we're getting far afield. Where the current location of the children is, is not relevant in the [trial court's] view at this point in time. So that objection would be sustained."[9]

C. No violation of a constitutional right.

The location of the children at the time of trial was minor or subsidiary and, at best, only slightly relevant to the issues.

Wish suggests that if Valerie sent the children to Argentina, then it would have revealed that she lied when she testified that the children were in New Jersey. The problem is, Valerie never said where the children were staying while she was in California testifying. Thus, even if Valerie had been allowed to answer defense counsel's question, and if she had given him the answer that he hoped to elicit, her credibility would not have been damaged.

If the children were in Argentina at the time of trial, a finder of fact could infer that Valerie was doing everything in her power to keep them away from Wish. But that

---

[9]     Both parties presume that the trial court relied on Evidence Code section 352 in addition to finding the evidence irrelevant.

13

inference would be speculative without more information. For example, if the children were in Argentina, was it permanent or only during the trial? Did Valerie keep the location a secret from Wish? Was Wish permitted to have telephone contact? Was he being deprived of court ordered visitation? Did Valerie have authority to send the children to another country? In any event, if Valerie was trying to prevent Wish from having contact with the children at the time of trial, that is remote evidence of what she was trying to accomplish when she reported the July 15, 2011, incident. And even if that was her goal on the night in question, that does not by itself undermine her version of events. The more important question is why she harbored that goal. As a mother, she may simply have wanted to keep the children away from Wish because he threatened to kill them. On the other hand, it is not beyond the pale of human nature for a mother to prevent a father from seeing his children out of anger, spite or the desire to start a new life. It could be rationally inferred that a mother who was actively preventing a father from seeing his children might be willing to falsely report that she was attacked by the father in order to gain complete legal control of the children. This is the very inference Wish relies on to suggest that Valerie had a motive to lie, and that she fabricated the July 15, 2011, incident. The problem is that using the location of the children as proof that Wish did not commit the charged crimes involves a long chain of shaky inferences built on mere possibilities rather than probabilities. That chain does not have significant probative value. As a result, we easily conclude that Wish was not deprived of the right to present a defense.

Not only was the excluded evidence marginal, Wish's defense was amply supported by other evidence.

The record called Valerie's credibility into question. Below, we list a selection of examples. While Valerie testified that Wish knocked her down and tied her up on July 25, 2003, Tyger testified that Valerie tackled Wish off his crutches while he was recovering from knee surgery and then starting kicking and punching him. As for what transpired on July 15, 2011, at Giarrizzo's home, Valerie and Giarrizzo provided differing stories. According to Valerie, her twins and Giarrizzo's twins were planning a

14

sleepover. At about 6:00 p.m., Valerie drove 20 minutes away to talk to a doctor about placing her colonic hydrotherapy machine in his office. Then she drove back home and went to Giarrizzo's house to collect the children for the drop-off with Wish. But Valerie's children wanted to switch weekends. They convinced Valerie to ask Wish for permission. Giarrizzo, on the other hand, testified that she did not see Valerie leave prior to 7:15 p.m. There was no mention of a job interview. Valerie said she was going to meet with Wish to discuss some court documents and did not want to bring the children and risk them seeing Wish get upset. Giarrizzo and Valerie did not form a plan for the children once Valerie came back from the park.

Next, we turn to Valerie's story about Wish's attack. The story kept changing and was full of holes. She testified that when she first arrived at the park, Wish asked where the children were and she told him. And she repeatedly asked Wish if he would agree to switch weekends and let the children go to a sleep over. But Deputy Formica testified that Valerie told him that when Wish asked where the children were, she said nothing in response. As for the crimes, she testified that she saw Wish hit her with a fist, and also that she did not see what hit her. Though she said Wish hit her with a fist, she said she felt something cold and sharp. At trial, Valerie stated that Wish hit her after throwing divorce papers in his car and suddenly turning around, but in the hospital she told Deputy Formica that Wish hit her after she walked toward her car and he stopped her. Valerie testified that after she was punched, blood poured out of her laceration, went down her face and all over her clothes. The sheriff's deputies found no blood at the crime scene, nor did they find any blood on Wish. Moreover, Deputy Formica did not see any blood on Valerie's clothes. Last, we note that when Valerie testified, she did not mention bleeding from her nose. However, she complained to Dr. Privett that she had been bleeding from the nose. And, according to Deputy Formica, she told him that when she was bleeding from the nose, it was profuse. Based on all the conflicting testimony, the jury had grounds to disbelieve Valerie.

Beyond these examples of conflicting testimony and changing stories, there were aspects of Valerie's testimony that could have given a reasonable juror pause. For

15

example, on July 25, 2003, how did Valerie's parents happen to show up inside her house at just the right time to untie her? After Wish threatened to kill Valerie and her children, why did Valerie go to the sheriff's station without first picking up her children or calling Giarrizzo to warn her of the threat? What caused Valerie to feel something cold and sharp hit her in the face? Why was Valerie bleeding profusely from the nose if Wish hit her above the left eyebrow?

Moving on to the next point, there was evidence that Valerie was using the July 15, 2011, incident to keep and control the children, that she had prevented Wish from contacting the children, and that she had motive to lie about the July 15, 2011, incident. After Valerie obtained legal status in the United States, she began a relationship with Sorge while still married to Wish. She even told Wish about the relationship. At the first opportunity following the December 25, 2010, incident, Wish drove the children to New Jersey without Wish's permission. She brought them back only due to a court order. After the July 15, 2011, incident, she told Deputy Carillo that she wanted Wish prosecuted, and she obtained a restraining order. Then, with the permission of the family court, she moved the children to New Jersey. At trial , she testified that she did not want Wish to have custody of the children, and she did not want him to have visitation. Simply stated, the evidence elicited at trial depicted a woman trying to forge a new life and leave Wish behind.

The bottom line is that the jury heard significant probative evidence undermining Valerie's credibility and suggesting that she had fabricated the crimes. Thus, Wish was permitted to present his defense.

**II. Prior Acts of Domestic Violence.**

The trial court allowed the People to present evidence of the domestic violence incidents on July 25, 2003, and December 25, 2010. Wish assigns error on the theory that the evidence was more prejudicial than probative and therefore should have been excluded under Evidence Code section 352. Upon review, we conclude that the trial court did not abuse its discretion.

16

A.  The law.

In general, evidence of prior conduct is inadmissible to prove that a person has a propensity to engage in that conduct.  (Evid. Code, § 1101.)  But "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."  (Evid. Code, § 1109, subd. (a)(1).)  As previously indicated, Evidence Code section 352 permits a trial court to exclude evidence if the probative value is substantially outweighed by the danger it will create undue prejudice.  The danger of undue prejudice arises when "'evidence . . . uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

We review rulings under Evidence Code section 352 for an abuse of discretion. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

B.  The relevant proceedings.

Prior to trial, the trial conducted hearings pursuant to Evidence Code section 402.  It was asked to rule on whether the People could present evidence of prior acts of domestic violence occurring on July 25, 2003, March 13, 2006,[10] and December 25, 2010.  Valerie and Tyger testified.  At the conclusion of the testimony and argument, the trial court conducted an analysis under Evidence Code section 352.  It found that "the probative value is not substantially outweighed by the prejudicial effect and the [trial court] is going to allow in the . . . July 25, 2003 incident, and the December 25, 2010 incident[.]"  The trial court excluded the March 13, 2006, incident.

---

[10]     According to Valerie, on March 13, 2006, she was in a car with Wish.  He tried to take a cell phone away from her and they struggled.  He eventually obtained the cell phone and threw it out the car window.

17

C. No abuse of discretion.

The two prior acts of domestic violence by Wish against Valerie, the same victim in the charged offenses, were "highly relevant and probative[.]" (*Hoover*, *supra*, 77 Cal.App.4th at p. 1029.) The evidence showed Wish's propensity to commit violent acts against Valerie, and it undermined his claims that Valerie fabricated the July 15, 2011, incident. Moreover, the two prior acts were not more inflammatory than the offenses for which Wish was on trial. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 534, fn. 11 ["Courts are primarily concerned where the past bad act was 'more inflammatory' than the offense for which the defendant is on trial"].) The December 25, 2010, incident was mild compared to the July 15, 2011, incident. It is true, as Wish suggests, that the allegation that he punched Valerie in the stomach while she was pregnant on July 25, 2003, is horrific. But she did not have to go to the hospital, and there is no evidence that she sustained any injuries from that incident. In contrast, when Wish struck Valerie in the head on July 15, 2011, she suffered a laceration that caused her to bleed profusely. She had to go to the hospital and receive 13 stitches. Thus, the July 15, 2011, was worse than the incident that occurred in 2003.

Regarding the 2003 incident, Wish complains that it was too remote. But we cannot fault the trial court for admitting it. The Court of Appeal has recognized that "[r]emote prior conduct is, at least theoretically, less probative of propensity than more recent conduct[,]" especially "if the defendant has led a substantially blameless life in the interim[.]" (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 534.) But courts have allowed prior domestic violence dating back 10 years before the current offense. (*Ibid*.) There is no specific time limit. Here, the incident was only eight years old at the time of the current offense, and there was evidence that Wish had engaged in domestic violence on more recent occasions. Because Wish had not lived a blameless life in the interim, and because eight years is well within the ballpark of what courts allow, we conclude that the 2003 incident was not too remote.

In sum, the trial court's decision to allow the two prior acts of domestic violence comports with case law.[11]

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
                     ASHMANN-GERST


We concur:


_____, J.
          CHAVEZ


_____, J.[*]
          FERNS

---

[11]     Wish contends that the exclusion of the location of the children at the time of trial and the admission of prior acts of domestic violence under Evidence Code section 1109 violated his constitutional rights, and that they both independently support reversal. In the alternative, he argues that reversal is required by the cumulative impact of those violations. Because we conclude that the trial court did not infringe on Wish's federal rights, cumulative impact is moot.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.